United States Court of Appeals,

Eleventh Circuit.

No. 94-2976.

Myrna CHEFFER, individually;  Judy Madsen, individually,
Plaintiffs-Appellants,

v.

Janet RENO, Attorney General of the United States of America, in
her official capacity;  Charles R. Wilson, United States Attorney
for the Middle District of Florida, in his official capacity,
Defendants-Appellees.

June 23, 1995.

Appeal from the United States District Court for the Middle
District of Florida. (No. 94-611-CIV-ORL-18), G. Kendall Sharp,
Judge.

Before ANDERSON and CARNES, Circuit Judges, and RONEY, Senior
Circuit Judge.

ANDERSON, Circuit Judge:

Appellants, anti-abortion activists, challenge the
constitutionality of the Freedom of Access to Clinic Entrances Act
of 1994 (the Access Act or Act), Pub.L. No. 103-259, 108 Stat. 694
(1994) (codified at 18 U.S.C. § 248). Appellants argue that
Congress lacks authority to pass the Access Act and, therefore, the
Act infringes on state sovereignty in violation of the Tenth
Amendment. Appellants also challenge the Act's constitutionality
on its face. They urge that the Act is vague and overbroad,
content and viewpoint based, and acts as a prior restraint, in
violation of their First Amendment free speech rights. Appellants
further claim that the Act violates the First Amendment's Free
Exercise Clause and the Religious Freedom Restoration Act of 1993
(RFRA), 42 U.S.C. §§ 2000bb to 2000bb-4. Finally, appellants argue
that the Access Act is unconstitutional because it imposes

excessive fines and is cruel and unusual under the Eighth Amendment.[1] The district court dismissed appellants' claims. Because we find the Act withstands appellants' constitutional challenges, we affirm.

## I. BACKGROUND

Congress passed the Access Act in response to increasing incidents of violence and obstruction at abortion clinics.[2] The stated purpose of the Act is "to protect and promote the public safety and health and activities affecting interstate commerce by establishing Federal criminal penalties and civil remedies for certain violent, threatening, obstructive and destructive conduct that is intended to injure, intimidate or interfere with persons seeking to obtain or provide reproductive health services." Act, § 2. The Act imposes civil and criminal penalties against anyone who:

> (1) by force or threat of force or by physical obstruction, intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services; ... or

---

[1]Appellants also assert that the Access Act violates their First Amendment right to Freedom of Assembly. Although appellants have listed Freedom of Assembly in their statement of the issues, they have not addressed the issue in their brief. Therefore, this issue is deemed abandoned. *Love v. Deal,* 5 F.3d 1406, 1407 n. 1 (11th Cir.1993); *see also* Fed.R.App.P. 28(a)(5).

[2]Congress noted that from 1977 through April 1993, more than 1,000 acts of violence against providers of abortion services were reported in the United States. S.Rep. No. 117, 103 Cong. 1st Sess. 3 (1993). "These acts included at least 36 bombings, 81 arsons, 131 death threats, 84 assaults, two kidnappings, 327 clinic "invasions,' and one murder." *Id.* In addition, over 6,000 clinic blockades and other disruptions were reported over the same period. *Id.*

(3) intentionally damages or destroys the property of a facility, or attempts to do so, because such facility provides reproductive health services....

Act, § 3(a) (codified as 18 U.S.C. § 248(a)).[3]

Appellants, Myrna Cheffer and Judy Madsen, are strongly opposed to the practice of abortion.  They assert that prior to the enactment of the Access Act, they attempted to persuade pregnant women and others to seek alternatives to abortion through the distribution of literature, oral protest, and sidewalk counseling outside of abortion clinics.  In addition, Madsen admits that she has  participated in sit-in's violating the trespass laws. [4] Appellants have not been arrested or charged with violation of the Access Act.  However, appellants urge that they have been "chilled" in the exercise of their constitutional rights because they fear punishment under the Act for their expressive activity in opposition to abortion.

II. CONGRESS' AUTHORITY TO PASS THE ACCESS ACT

Appellants assert that Congress lacked authority to pass the Access Act, and thus that the Act infringes on state sovereignty under the Tenth Amendment.  The Tenth Amendment provides:  "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.  Therefore, Congress' valid exercise of authority delegated to it under the

---

[3]The Act also protects places of religious worship.  *See* Act, § 3(a)(2) (codified as 18 U.S.C. § 248(a)(2)).  The provisions which deal with such protection are not at issue in this case.

[4]Cheffer, on the other hand, contends that she has never knowingly violated any law.

Constitution does not violate the Tenth Amendment. *United States v. Lopez,* 459 F.2d 949, 951 (5th Cir.), *cert. denied,* 409 U.S. 878, 93 S.Ct. 130, 34 L.Ed.2d 131 (1972).[5]

Congress identified both the Commerce Clause and section 5 of the Fourteenth Amendment as sources of its authority to pass the Access Act. Act, § 2. Recently addressing a similar constitutional attack against the Access Act, the Fourth Circuit concluded that the Act is within Congress' Commerce Clause power. *American Life League, Inc. v. Reno,* 47 F.3d 642, 647 (4th Cir.1995). We agree with the Fourth Circuit that the Access Act is within Congress' Commerce power, and adopt the reasoning in Part III.A. of the *American Life League* decision on this issue.

However, we pause to discuss the effect on this case of the recent Supreme Court Commerce Clause decision, *United States v. Lopez,* --- U.S. ----, 115 S.Ct. 1624, --- L.Ed.2d ---- (1995). Decided after *American Life League, Lopez* struck down the Gun-Free School Zones Act as exceeding Congress' authority under the Commerce Clause. *Id.* at ---- - ----, 115 S.Ct. at 1630-31. The Gun-Free School Zones Act made it a federal offense "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone." 18 U.S.C. § 922(q)(1)(A). In enacting the Gun-Free School Zones Act, Congress made no findings on whether the Act was within its Commerce Clause authority. In particular, no express

---

[5]In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

legislative findings were made regarding the effects upon interstate commerce of gun possession in a school zone. --- U.S. at ----, 115 S.Ct. at 1631. Although the Court noted that "Congress normally is not required to make formal findings as to the substantial burdens that an activity has on interstate commerce," *id.,* such findings assist the Court in evaluating whether the regulated activity "substantially affects" interstate commerce in cases where the effect on commerce is not obvious. *Id.* at ---- - ----, 115 S.Ct. at 1631-32. The Court held that the Gun-Free School Zones Act exceeded Congress' commerce authority to regulate activities that "substantially affect" interstate commerce; "[t]he Act neither regulates a commercial activity nor contains a requirement that the possession [of a firearm] be connected in any way to interstate commerce." *Id.* at ----, 115 S.Ct. at 1626.

Unlike the Gun-Free School Zones Act, the Access Act does regulate commercial activity, the provision of reproductive health services. Moreover, as the Fourth Circuit noted, extensive legislative findings support Congress' conclusion that the Access Act regulates activity which substantially affects interstate commerce. *American Life League,* 47 F.3d at 647. Congress found that doctors and patients often travel across state lines to provide and receive services, *id.;* in other words, there is an interstate market both with respect to patients and doctors. In addition, the clinics receive supplies through interstate commerce. *Id.* Congress further found that violence, and physical obstruction of clinic entrances, threatened interstate commerce in the

provision of reproductive health services. *Id.* Thus, in protecting the commercial activities of reproductive health providers, the Access Act protects and regulates commercial enterprises operating in interstate commerce. *Lopez,* --- U.S. at ----, 115 S.Ct. at 1630 ("Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained.").[6] Congress' findings are plausible and provide a rational basis for concluding that the Access Act regulates activity which "substantially affects" interstate commerce. Thus, the Access Act is a constitutional exercise of Congress' power under the Commerce Clause. Because the Access Act

---

[6]We are not persuaded by the *Wilson* court's reasoning that the Access Act is beyond Congress' Commerce Clause authority because the Act does not regulate commercial entities, i.e. the reproductive health providers, "but rather regulates private conduct affecting commercial entities." *United States v. Wilson,* 880 F.Supp. 621, 628 (E.D.Wis.1995). The *Wilson* court cites no authority, nor can we find any, for the proposition that Congress' Commerce Clause authority extends only to the regulation of commercial actors, and not private individuals who interfere with commercial activities in interstate commerce. To the contrary, the Court often finds valid under the Commerce Clause statutes which penalize behavior substantially affecting interstate commerce without regard to the actor's commercial or private status. *E.g., Russell v. United States,* 471 U.S. 858, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985) (Upholding 18 U.S.C. § 844(i), which penalizes "*[w]hoever* maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in ... any activity affecting interstate or foreign commerce...." (emphasis added)); *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960) (Upholding the Hobbs Act which criminally penalizes, "*[w]hoever* in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion ... or [by] commit[ting] or threaten[ing] physical violence to any person or property...." 18 U.S.C. § 1951 (emphasis added)). *See also United States v. Dinwiddie,* No. 95-0010-CV-W-8, 1995 WL 225585, at *5, --- F.Supp. ----, ---- (W.D.Mo. April 12, 1995) (declining to follow *Wilson* and instead following *American Life League* ).

is within Congress' Commerce Clause power, it does not violate the Tenth Amendment.[7]

## III. FREEDOM OF EXPRESSION

*American Life League* also addressed First Amendment facial challenges to the Access Act.  47 F.3d at 648-654.  The Fourth Circuit found that the Access Act was not unconstitutionally vague or overbroad, nor was the Act content or viewpoint based.  *Id.* Unable to improve on the Fourth Circuit's analysis, we follow *American Life League* and adopt its rationale on the free speech issues.

We add only a brief elaboration.  The clear implication in *American Life League* is that the term "force" in the context of the instant statute means "physical force."  *Id.* at 648 ("The use of force or violence is outside the scope of First Amendment protection. *Wisconsin v. Mitchell,* --- U.S. ----, ----, 113 S.Ct. 2194, 2199, 124 L.Ed.2d 436 (1993) ("a physical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment')").  We agree with the Fourth Circuit that the clear meaning of "force" in this statute is "physical force." Thus, the prohibition of "force" in this statute does not involve pure speech;  rather, it involves only physical force.

The term "force" is often interpreted to mean "physical force."  See *Johnson v. Mississippi,* 421 U.S. 213, 222-27, 95 S.Ct. 1591, 1597-99, 44 L.Ed.2d 121 (1975) (interpreting similar

----

[7]Because we find that the Act is a valid exercise of Congress' Commerce Clause power, it is not necessary for us to reach the issue of whether Congress also has authority to pass the Act under the Fourteenth Amendment.

language—"by force or threat of force willfully injures, intimates, or interferes with"—to provide protection against violence). The context of this particular statute reinforces the "physical force" interpretation. The Access Act proscribes intentional injury, intimidation or interference, but only if the same is committed "by force, threat of force or physical obstruction." Act, § 3(a)(1) (codified as 18 U.S.C. § 248(a)(1)). The only terms in the instant statute which by themselves might have a broader sweep are carefully delimited. Thus, the term "intimidation" is defined: "to place a person in reasonable apprehension of bodily harm." Act, § 3(e)(3) (codified as 18 U.S.C. § 248(e)(3)). The activity proscribed by the broadest terms of the statute is "intimidation" caused by "threat of force." As demonstrated above, the activity thus proscribed is a threat of physical force placing a person in reasonable apprehension of bodily harm.

In addition to injury and intimidation, the statute also prohibits "interference with" a person because the person is obtaining or providing reproductive health services. Act, § 3(a)(1) (codified as 18 U.S.C. § 248(a)(1)). Again, however, the statute prohibits such interference only if accomplished through "force or threat of force or by physical obstruction." *Id*. The term "interfere with" is defined to mean: "to restrict a person's freedom of movement." Act, § 3(e)(2) (codified as § 248(e)(2)). The term "physical obstruction" is defined to mean: "rendering impassable ingress to or egress from a facility that provides reproductive health services ... or rendering passage to or from such a facility ... unreasonably difficult or hazardous." Act, §

3(e)(4) (codified as § 248(e)(4)). Thus, the statute proscribes only a restriction of a person's freedom of movement and only if accomplished by physical force or the threat thereof or by obstruction rendering passage unreasonably difficult or hazardous.

For the reasons articulated in Part IV.A. through D. of the *American Life League* opinion,[8] as elaborated above, we readily conclude that the Access Act is not content or viewpoint based, is not unconstitutionally vague or overbroad, and does not violate appellants' First Amendment rights.[9]

IV. FREE EXERCISE CLAUSE AND RELIGIOUS FREEDOM RESTORATION ACT

*American Life League* also addressed the argument that the Act offends the First Amendment's Free Exercise Clause and the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. §§ 2000bb to 2000bb-4.[10] We concur with the Fourth Circuit that the

---

[8]Because appellants in the instant case do not argue that the civil damages provisions of the Act violate the First Amendment, we need not address that issue. See Part IV.E. of *American Life League,* 47 F.3d at 653-54.

[9]Appellants also argue that the Act is unconstitutional as a prior restraint. In *Woodall v. Reno,* 47 F.3d 656 (4th Cir.1995), *petition for cert. filed,* 63 U.S.L.W. 3644 (Feb. 21, 1995), the plaintiffs argued that the injunctive provisions of the Access Act constituted prior restraints on speech. The Fourth Circuit declined to assume that a court would issue an injunction in violation of the well-established prior restraint doctrine. *Id.* at 658. Noting that plaintiffs did not claim they were presently subject to an injunction, the court declined to entertain the issue until a more concrete controversy arose. *Id.* Appellants in the instant case do not assert a prior restraint on the basis of possible injunctive relief. Rather, appellants' prior restraint argument boils down to an assertion of extreme chill in the exercise of their First Amendment rights due to the Act's vagueness and overbreadth. Because we hold that the Access Act is not unconstitutionally vague or overbroad, appellants' prior restraint argument is meritless.

[10]The RFRA was passed before the Access Act by the same Congress that passed the Access Act. Normally, where there is a

Act is generally applicable and neutral toward religion and, therefore, does not offend the First Amendment's Free Exercise Clause. 47 F.3d at 654. We adopt the reasoning of Part V.A. of the *American Life League* opinion.

Appellants also argue that the Access Act violates their rights under the Religious Freedom Restoration Act (RFRA). The RFRA provides in pertinent part:

> Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—1) is in furtherance of a compelling governmental interest and 2) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000bb-1. In *American Life League,* the Fourth Circuit found that the plaintiffs had adequately pled that the Act substantially burdened their religious practice, but held that the Act survived RFRA scrutiny as the least restrictive means to achieve compelling government interests. 47 F.3d at 654-656. Unlike the plaintiffs in *American Life League,* the appellants here have not argued that the Access Act "substantially burdens" their religious practice. Appellants' brief on appeal merely asserts that they have a sincerely held religious belief that abortion is murder, and that the Access Act chills their expression of that belief. However, appellants do not assert that the exercise of

_____

conflict between an earlier statute and a later enactment, the later statute governs. *I.C.C. v. Southern Ry. Co.,* 543 F.2d 534, 539 (5th Cir.1976). Therefore, under the usual rule the later-passed Access Act could not violate the RFRA. However, the RFRA provides that "Federal statutory law adopted after November 16, 1993 is subject to [the RFRA] unless such law explicitly excludes such application by reference to [the RFRA]." 42 U.S.C. § 2000bb-3(b). Thus, because the Access Act was adopted on May 26, 1994, and does not explicitly exclude application of the RFRA, the Act is subject to the terms of the RFRA.

their religion requires them to use physical force or threats of physical force to prevent abortions. Moreover, unlike the plaintiffs in *American Life League,* appellants do not argue that the exercise of their religion requires them to physically obstruct clinic entrances. Because we hold that the Access Act does not chill appellants in the exercise their First Amendment right of expression, it follows that they have not been chilled in the particular expression of their religious belief that abortion is murder. The Access Act leaves ample avenues open for appellants to express their deeply-held belief so long as this expression does not involve physical force, threats of such force, or physical obstruction. Therefore, as the Act does not "substantially burden" the only religious practices that appellants assert on appeal, we hold that the Act survives appellants' challenge under the RFRA without reaching, as the Fourth Circuit did, whether the Act is the least restrictive means to further a compelling state interest.[11]

---

[11]Questions have been raised about the constitutionality of the RFRA. *See, e.g., Canedy v. Boardman,* 16 F.3d 183, 186 n. 2 (7th Cir.1994). The questions include whether the RFRA violates the separation of powers doctrine, *see Flores v. City of Boerne,* 877 F.Supp. 355 (W.D.Tex.1995), or the Establishment Clause, *see* Scott C. Idleman, *The Religious Freedom Restoration Act: Pushing the Limits of Legislative Power,* 73 Tex.L.Rev. 247 (1994), and whether Congress has the authority to enact such legislation in the first instance, *see* Marci A. Hamilton, *The Religious Freedom Restoration Act: Letting the Fox into the Henhouse under Cover of Section 5 of the Fourteenth Amendment,* 16 Cardozo L.Rev. 357 (1994). These questions are muddled considerably in this case because the statute being challenged, the Access Act, is not a state statute but is instead federal legislation enacted by the same Congress that earlier enacted the RFRA. It may be, in these circumstances, that the RFRA can be viewed as simply having the effect of a contemporaneously enacted rule of construction. Whatever the answers are to this and the other questions about the RFRA, we need not decide in this case, because we hold that appellants have not implicated the RFRA by arguing that the Access Act "substantially burdens" their religious practice.

## V. EIGHTH AMENDMENT CLAIMS

Finally, appellants argue that the Act violates the Eighth Amendment by inflicting cruel and unusual punishments and by imposing excessive fines. These issues were not before the Fourth Circuit in *American Life League.* Because appellants seek pre-enforcement review of the Access Act, we must determine as a threshold matter, whether appellants' Eighth Amendment claims are ripe. *See Hallandale Professional Fire Fighters Local 2238 v. City of Hallandale,* 922 F.2d 756, 759-60 (11th Cir.1991) (ripeness generally a concern in anticipatory attack on a statute, ordinance, regulation or policy). [12] Neither party raises the issue of ripeness. However, as we do not have subject matter jurisdiction to address unripe claims, *Greenbriar, Ltd. v. City of Alabaster,* 881 F.2d 1570, 1573 n. 7 (11th Cir.1989), we must nevertheless confront the issue. *Fitzgerald v. Seaboard System R.R., Inc.,* 760 F.2d 1249, 1251 (11th Cir.1985) ("A federal court not only has the power but also the obligation at any time to inquire into

---

[12]Because appellants make a pre-enforcement challenge to the Access Act, nominally all of their claims raise ripeness concerns. We note that the doctrine of ripeness is more loosely applied in the First Amendment context. *Fire Fighters Local 2238,* 922 F.2d at 760 (citing *Solomon v. City of Gainesville,* 763 F.2d 1212 (11th Cir.1985) and *International Soc. for Krishna Consciousness of Atlanta v. Eaves,* 601 F.2d 809, 817 (5th Cir.1979), in which pre-enforcement First Amendment challenges were allowed). Appellants' First Amendment claims allege that the Act currently "chills" specific protected expressive activities and, thus, present sufficiently concrete and immediate questions for review. *Cf. Fire Fighters Local 2238,* 922 F.2d at 762 (First Amendment claim not ripe when plaintiffs raise only a general claim of "chill" without asserting specifically what they "*might* want to do or say that *might* by protected by the first amendment but *might* chilled by the existence of the City's [challenged] policy" (emphasis in original)). Therefore, appellants' First Amendment claims are ripe.

jurisdiction whenever the possibility that jurisdiction does not exist arises.").

Eighth Amendment challenges are generally not ripe until the imposition, or immediately impending imposition, of a challenged punishment or fine. Although we have not previously had the opportunity to examine the doctrine of ripeness in the Eighth Amendment context, other circuits have found that Eighth Amendment claims of "cruel and unusual punishment" are not ripe when raised prior to the actual, or immediately pending, imposition of the challenged form of punishment. *See, e.g., 18 Unnamed "John Smith" Prisoners v. Meese,* 871 F.2d 881, 882-83 (9th Cir.1989) (Eighth Amendment challenge to proposed double bunking plan as cruel and unusual punishment not ripe); *Askins v. District of Columbia,* 877 F.2d 94, 97-99 (D.C.Cir.1989) (challenge to proposed transfer to another prison facility not ripe). By the same reasoning, challenges under the Excessive Fines clause are also generally not ripe until the actual, or impending, imposition of the challenged fine. *See, e.g. United States v. Fleetwood Enterprises,* 689 F.Supp. 389, 392 (D.Del.1988) (challenge to Eighth Amendment constitutionality of potential fines under Manufactured Housing Act not ripe for adjudication where defendant had been charged under the Act but fines had not yet been imposed by the court). Under the particular facts of this case, we apply the general rule that Eighth Amendment claims are not ripe until the impending imposition of a punishment or fine.

The ripeness doctrine raises both jurisdictional and prudential concerns. *Johnson v. Sikes,* 730 F.2d 644, 648 (11th

Cir.1984). It asks whether there is sufficient injury to meet Article III's requirement of a case or controversy and, if so, whether the claim is sufficiently mature, and the issues sufficiently defined and concrete, to permit effective decisionmaking by the court. *Id.* The purpose of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). In deciding whether a claim is ripe for adjudication or review, we look primarily at two considerations: (1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration. *Id.*

Appellants' Eighth Amendment claims fail the prudential, or "fitness" prong of the ripeness inquiry. The parties do not raise a purely legal issue which we can decide in the abstract without further factual development. *Cf. Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515-16 (issue of statutory construction ripe for review when raised only a "purely legal" question of congressional intent). Instead, appellants' allegations amount to mere speculation about contingent future events. They urge that they may be arrested and convicted under the Access Act and, if so, that they may be subject to the maximum imprisonment and civil penalties. Because the Access Act sets only the maximum penalties, leaving the courts with broad discretion to determine length of imprisonment or the amount of fines or civil penalties to be assessed in each case, Act, §§ 3(b), (c)(2)(B) (codified as 18

U.S.C. §§ 248(b), (c)(2)(B)), we cannot determine from the face of the Act what penalties will actually be imposed. We can only speculate as to whether the future applications urged by appellants will come to pass. Moreover, without the facts of a particular violation, we cannot decide whether a specific fine will be excessive or punishment so cruel and unusual as to violate the Eighth Amendment. Thus, such inquiry is better postponed until the issues are presented in the more concrete circumstances of a challenge to the Act as applied.

Finding that there are prudential reasons to postpone adjudication of the Eighth Amendment challenges, we must ask whether such delay will work a "hardship" on appellants. Although appellants have not been arrested or convicted under the Act, we note that a party does not have to risk probable criminal sanctions in order to bring a justiciable pre-enforcement challenge. *Steffel v. Thompson,* 415 U.S. 452, 459, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974). Potential litigants suffer substantial hardship if they are forced to choose between foregoing lawful activity and risking substantial legal sanctions. *See id.* at 462, 94 S.Ct. at 1217 (The "hapless plaintiff" should not have to risk placing himself "between the Scylla of intentionally flouting [the] law and the Charybdis of forgoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding."). Appellants allege that they fear severe punishment under the Access Act for their constitutionally protected expressive activities in opposition to abortion. However, we have already held that the Act does not infringe on

appellants' First Amendment right to free speech;  the Act does not threaten any of their lawful expressive activities.  Therefore, appellants have failed to show that the mere existence of the Access Act causes them substantial hardship.  Moreover, that we decline to review appellants' Eighth Amendment claims today does not deny them the opportunity to raise these claims in the future should a concrete case or controversy arise.  *See Flowers Industries v. F.T.C.,* 849 F.2d 551, 553 (11th Cir.1988) (noting that, although the plaintiff's claims are not ripe as yet, the plaintiff will ultimately have the opportunity to raise those claims as a defense to an FTC enforcement action if enforcement is ever sought).  Thus, we find that appellants' Eighth Amendment claims are not ripe.

## VI. CONCLUSION

For the foregoing reasons we AFFIRM the district court's dismissal of appellants' claims.[13]

AFFIRMED.

---

[13]The motion of the National Abortion Federation to intervene is denied.