**Bruce LUCERO, M.D., et al., Plaintiffs,**

**v.**

**Father David C. TROSCH, Defendant.**

**Civil Action No. 95–0308–CB–M.**

United States District Court,
S.D. Alabama,
Southern Division.

May 28, 1996.

John P. Furman, Mobile, AL, Alan M. Pollack, New York City, Timothy M. Beasley, Birmingham, AL, Jeffrey T. Stearns, Brewton, AL, for Plaintiffs.

J. Charles Wilson, Mobile, AL, for defendant.

## ORDER

BUTLER, Chief Judge.

A non-jury trial was held in this cause on April 23, 1996. After careful review of the evidence presented at trial, the proposed findings of fact and conclusions of law submitted by the parties, and the supporting briefs, the Court hereby issues the following findings of fact and conclusions of law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### I. Findings of Fact

Defendant Father David C. Trosch ("Fr. Trosch"), an ordained Roman Catholic priest, has been an outspoken advocate of what is known as the "doctrine of justifiable homicide" since the killing of Dr. David Gunn by an anti-abortion protester in early 1993. Plaintiffs' Exh. 57, at 62. Fr. Trosch has summarized this "doctrine" in the following manner: "I believe that anyone participating in the direct act of murdering innocent human beings, can have [his or her] life forfeited in the defense of innocent human life." Plaintiffs' Exh. 43, at 2. The rationale offered by Fr. Trosch for his adoption of the "justifiable homicide doctrine" is his belief that direct participants in the provision of abortion services are actively committing murder, and that killing such people would be a justifiable act because it would save innocent human lives (i.e., unborn children). Plaintiffs' Exh. 57, at 25. Applying this "doctrine" to real-world events, Fr. Trosch has declared that the actions of those who killed abortion providers such as Dr. Gunn and Dr. James Britton in recent years were justified if they were motivated by a desire to protect innocent human life. *Id.* at 26.

Plaintiff Bruce Lucero, M.D. ("Dr. Lucero"), is a physician who performs reproductive health services, including abortion services, and operates an adoption agency through his clinic in Birmingham, Alabama.[1] Though his practice initially encompassed family practice and pediatrics, Dr. Lucero has provided abortion services to his patients on a full-time basis since October of 1986, when anti-abortion protesters "scared away" his family practice patients. Dr. Lucero first became aware of Fr. Trosch's justifiable homicide theory in August of 1993, when the defendant garnered national media attention after attempting unsuccessfully to run an explicit, disturbing cartoon captioned "Justifiable Homicide?" as a paid advertisement in the Mobile newspaper.[2] In September of

1. Although no reference to it is made in the joint pretrial order submitted by the parties, Dr. Lucero's clinic, New Woman All Woman Health Care, is also named as a plaintiff in the complaint. It is unclear what claim, if any, the clinic is asserting against Fr. Trosch.

2. This cartoon depicts a wide-eyed doctor in surgical garb standing over a woman who is lying

1994, Dr. Lucero watched Fr. Trosch's televised appearance on *The Shelly Stewart Show* ("*Shelly Stewart*"), a Birmingham-area talk show. While on *Shelly Stewart*, the defendant made a number of incendiary statements regarding his justifiable homicide beliefs, including the following:

> "Q: If everyone listened to you, there would be people by the hundreds, by the thousands, killed, wouldn't you say?
>
> A: No, not at all. I believe if 20, 30, 40 doctors, abortionists, their staffs, were killed, the rest of them would get out of the business."
>
> \* \* \* \* \* \*
>
> "Q: Would you possibly yourself pull the trigger and kill someone for performing an abortion?
>
> A: Let me put it this way: Elijah slit the throats of 450 profits [sic] of Al because of the evil they did, and they were not even murderers, so if Elijah could do it I suppose I could.
>
> Q: You could kill?
>
> A: In the defense of innocent human beings, yes."

Plaintiffs' Exh. 43, at 3, 6–7.

Dr. Lucero was not a guest on this episode of *Shelly Stewart*, and Fr. Trosch did not make any statements which specifically referenced Dr. Lucero during the course of his appearance on that program. Rather, if anyone was a target of much of Fr. Trosch's rhetoric on *Shelly Stewart*, it was Diane Der-

zis, M.D. ("Dr. Derzis"), a provider of abortion services who also appeared on the show. Although Fr. Trosch stated that he would have "no problem" with Dr. Derzis being killed in defense of innocent human life, he tempered his remark via the following exchange:

> "Q: Father Trosch, is her life in danger because of your rhetoric?
>
> A: It could be. It could well be, if someone locally who knows her, knows where her clinic is. *From me personally, no, I do not travel around looking for problems like that,* but if someone in this area finally recognized that as she says, there is a consistent life ethic from the moment of conception all the way to natural death, yes, then, she should have fear."

Plaintiffs' Exh. 43, at 2 (emphasis added).

In September or October of 1994, Dr. Lucero was invited to appear as a guest with Fr. Trosch on the *Geraldo Show* ("*Geraldo*"). He agreed to do so, and participated in a taping session which was conducted in New York, New York, on October 5, 1994.[3] Dr. Lucero had not met Fr. Trosch prior to this appearance; however, he was well-acquainted with Fr. Trosch's work and beliefs. In addition to having seen the *Shelly Stewart* episode on which Fr. Trosch had appeared, Dr. Lucero had read a number of Fr. Trosch's writings, as well as various newspaper articles chronicling Fr. Trosch's controversial views.[4] Despite actual knowledge of

---

on a table. The doctor wields a shining knife blade which is poised over the woman's stomach, in apparent preparation to perform an abortion. Standing behind the doctor is a shadowy figure holding a gun to the doctor's back. The question mark in the cartoon is comprised of an entire fetus and the head of another fetus. *See* Plaintiffs' Exh. 19. Fr. Trosch testified at trial that this cartoon (which he designed) was intended to pose the question of whether both, one, or neither of the two potential killings depicted in the cartoon would be justifiable.

**3.** The *Geraldo* taping did not mark Dr. Lucero's first foray into the national spotlight on the ongoing abortion debate. On the contrary, Dr. Lucero had previously appeared with a prominent abortion foe on the nationally-televised *Sonya Live* program in March of 1994. At that time, another guest on the program, Paul Hill, espoused a variation of the "justifiable homicide

doctrine" adopted by the defendant. In spite of concerns that his *Sonya Live* appearance might jeopardize his safety, Dr. Lucero testified, he agreed to appear on the program with Paul Hill for the following reasons:

"One, because nobody else would go. Two, is there [are] not too many ways to stop that type of rhetoric from going on. And ... you have to show that there are other sides to the issue and to hopefully show that we will not necessarily be intimidated and that hopefully to point out that he was a coward and a hypocrite by not carrying out his justifiable homicide doctrine." Trial Transcript, at 84.

Some time after the *Sonya Live* taping, Paul Hill shot and killed Dr. Britton in Pensacola, Florida.

**4.** Among the documents reviewed by Dr. Lucero were the following: (1) a petition joined by Fr. Trosch which stated that the killing of Dr. Gunn

Fr. Trosch's extreme stance on the justifiable homicide issue, Dr. Lucero agreed to appear on *Geraldo* with Fr. Trosch. At trial, Dr. Lucero explained the purpose of his assent to the *Geraldo* appearance in the following manner:

"[I]t's very difficult to stop someone that is going to go public and advocate and encourage others and kill us. And the only way to stop something like that is to try to show the public that we are human people and that we are not mean spirited people, demonic people, or evil people.... And to try to persuade public support to stop Father Trosch. It was also to give Father Trosch a chance to recant...."

Trial Transcript, at 91.

The *Geraldo* episode on which the parties appeared was contentious, fast-paced, and emotionally charged.[5] Numerous other guests representing various perspectives on the "justifiable homicide" issue were present and participated in the debate. As is typical of sensationalist network daytime talk shows, the *Geraldo* host painted his guests as caricatures of themselves by posing pointed questions designed to spark extreme reactions from his guests, then interrupting them in mid-answer to pursue even more inflammatory lines of questioning. Fr. Trosch, in particular, rarely was permitted to answer a question fully or to complete a thought before Geraldo cut him off, and asked additional questions geared at ratcheting upward the emotional ante. Moreover, the various guests frequently interrupted each other, the result being that the proceedings lapsed into an uncontrolled shouting match on occasion.

Against this chaotic talk-show backdrop, Fr. Trosch made the following statements when questioned by Geraldo:

"Q: Father David Trosch, would you murder an abortion doctor if you had the gun in your hand?

A: No, I would not murder him, but I would kill him. There's a difference.

Q: Do you support the activities of Paul Hill, the man who killed Dr. John Britton?

A: —I rephrase that, I would approve of the killing, but it would not be murder.

Q: Sitting alongside you, Dr. Bruce Lucero, a doctor who admits to performing abortions—

A: —he is a mass murderer—

Q: —would you kill him?

A: He is a mass murderer and he should be dead. Absolutely.

Q: He should be dead?

A: Should be dead."

\*    \*    \*    \*    \*    \*

"Q: Father Trosch, do you have the courage to say that you would kill him?

A: He deserves to be dead, absolutely."

\*    \*    \*    \*    \*    \*

"Q: Father Trosch, man of the Cloth, how can you let [Dr. Lucero] walk out of this studio alive?

A: Very simply, I am presenting a problem philosophical, theological to the whole human race, and as long as I can present the question, I am more valuable to saving innocent human life than taking him out."[6]

Plaintiffs' Exh. 42, at 2, 3, 10.

Also appearing on that episode of *Geraldo* was Dr. Lucero's wife, Mala, ("Mrs. Lucero")

---

was justifiable if it had been intended to defend the lives of unborn children; (2) a *Mobile Register* article in which Fr. Trosch was quoted as saying that it would not bother him if his "Justifiable Homicide?" cartoon incited someone to kill an abortion doctor; (3) a magazine article which quoted Fr. Trosch as saying, "If 100 doctors need to die to save over one million babies a year, I see that as a fair trade"; and (4) a *Pensacola News Journal* article in which Fr. Trosch was quoted as saying, "If God should some day put a gun in my hand and put an abortionist in front of me, we would have to see what would happen." Plaintiffs' Exhs. 35, 37, 38, 41. Dr. Lucero also

reviewed a number of other documents containing similar descriptions of Fr. Trosch's beliefs. *See* Plaintiffs' Exhs. 33, 36, 39, 40, 44, 45.

5. During the trial of this cause, the Court viewed an unedited video tape recording of the *Geraldo* episode in its entirety.

6. This final exchange between the host and Fr. Trosch occurred at the very conclusion of the broadcast, as the final credits were rolling. Though the Court reviewed this portion of the tape several times, it was unable to discern the precise content of Fr. Trosch's response. How-

who is employed at Dr. Lucero's clinic and provides counseling to Dr. Lucero's patients.[7] In addition to his statements regarding Dr. Lucero, Fr. Trosch referred to Mrs. Lucero as a "murderess" for her role as a "direct accomplice" in providing abortions. *Id.* at 7. Fr. Trosch responded in the affirmative to a question posed by Geraldo as to whether Mrs. Lucero, like her husband, should die. *Id.*

After his experience on *Geraldo,* Dr. Lucero testified, he felt frightened and intimidated. To protect himself, his family, and his employees, Dr. Lucero has incurred certain security costs since his *Geraldo* appearance. In particular, Dr. Lucero has apparently hired security guards on an around-the-clock basis for himself, his wife, and his staff at the clinic. Moreover, he has reinforced and upgraded the security precautions which were previously in place at his clinic. These security measures were readily apparent and highly visible during the trial of this cause, as Dr. Lucero wore a bulletproof vest, appeared in the courtroom flanked by at least three uniformed security guards, and traveled to and from the courthouse in an armored van.[8] Dr. Lucero testified that these expenses will continue to be incurred for approximately twenty years as a result of Fr. Trosch's remarks on *Geraldo.*

Fr. Trosch has never visited Dr. Lucero's home, nor has he ever picketed outside his clinic. There was no evidence that Fr. Trosch has contacted or attempted to contact Dr. Lucero, his family, his patients, or his staff members at any time subsequent to the

airing of the *Geraldo* episode. Fr. Trosch and Dr. Lucero have neither corresponded nor otherwise communicated with each other since the taping of the show in October of 1994. Rather, the sole instances of direct contact between the parties occurred on *Geraldo* and in these federal court proceedings.

## II.  Conclusions of Law

■ The plaintiffs brought this action against Fr. Trosch pursuant to the Freedom of Access to Clinic Entrances Act ("FACE" or "the Access Act"), 18 U.S.C. § 248, the statute which prohibits anyone from using force or threats of force to injure, intimidate, or interfere with providers or recipients of reproductive health services. 18 U.S.C. § 248(a). The Access Act explicitly creates a civil right of action for persons aggrieved by such conduct. 18 U.S.C. § 248(c). Though the defendant asks the Court to declare FACE unconstitutional, this Court and many other courts have previously rejected constitutional challenges akin to the one now presented by Fr. Trosch, and have upheld the constitutionality of the statute. *See Lucero v. Trosch,* 904 F.Supp. 1336 (S.D.Ala.1995); *Cheffer v. Reno,* 55 F.3d 1517 (11th Cir.1995); *United States v. Soderna,* 82 F.3d 1370, (7th Cir.1996); *United States v. Dinwiddie,* 76 F.3d 913 (8th Cir.1996); *American Life League, Inc. v. Reno,* 47 F.3d 642 (4th Cir. 1995). The Court has previously considered and declined the defendant's invitation to declare FACE unconstitutional, and the defendant has offered no basis for reconsidera-

---

ever, the Court believes that the transcript properly reflects the essence and flavor of Fr. Trosch's remark, even though it may not be a verbatim quotation.

7. Mala Lucero is not a named plaintiff in this lawsuit.

8. The trial record is unclear as to Dr. Lucero's level of security protection prior to his appearance on *Geraldo.* Certainly, he took some modicum of security precautions as a matter of course prior to the *Geraldo* appearance. For instance, when Dr. Lucero married his wife in 1993, he wore a bulletproof vest to his wedding. More generally, it is inconceivable to the Court that Dr. Lucero did not bear substantial security expenses before the *Geraldo* taping. Such security expen-

ditures would have been necessitated in part by the fact that Dr. Lucero had endured numerous harrowing experiences prior to his appearance on *Geraldo,* including the following: (1) he had been chased by truckloads of protesters in Mississippi; (2) he worked for a time at a clinic in Pensacola which had been bombed on three occasions; (3) a clinic at which he worked was once invaded by protesters, who injured several staff members and destroyed equipment; and (4) protesters had gathered on the lawn of his home on multiple occasions. Additionally, Dr. Lucero was aware of (and profoundly affected by) the killings of Dr. Gunn and Dr. Britton prior to the *Geraldo* show. Thus, the extent to which Fr. Trosch's remarks on *Geraldo* prompted increased expenditures by Dr. Lucero is unclear from the testimony at trial.

tion of that decision at this time.[9] Therefore, the Court reiterates its previous determination that FACE is constitutionally valid.

▮▮▮ The Court must now consider the sole issue presented by these proceedings, whether Fr. Trosch's conduct is actionable under FACE, that is, whether his statements on *Geraldo* constituted a "threat of force" which intimidated or attempted to intimidate Dr. Lucero or the New Woman All Woman Clinic as providers of reproductive health services. 18 U.S.C. § 248(a). The Eleventh Circuit has interpreted FACE as proscribing threats of physical force which place a person "in reasonable apprehension of bodily harm." *Cheffer v. Reno,* 55 F.3d 1517, 1521 (11th Cir.1995). In the most recent appellate decision examining whether a statement constituted a "threat of force" actionable under FACE, the court determined that the nature of the statement must be gauged in light of the entire factual context in which it was made. *United States v. Dinwiddie,* 76 F.3d 913, 925 (8th Cir.1996); *see also United States v. Malik,* 16 F.3d 45, 49 (2d Cir.1994); *United States v. Gilbert,* 884 F.2d 454, 457 (9th Cir.1989). Among the factors which may be considered in evaluating whether a statement constitutes a threat of force are the following:

> "[T]he reaction of the recipient of the threat and of other listeners; whether the threat was conditional; whether the threat was communicated directly to its victim; whether the maker of the threat had made

similar statements to the victim in the past; and whether the victim had reason to believe that the maker of the threat had a propensity to engage in violence. This list is not exhaustive, and the presence or absence of one of its elements need not be dispositive." *Dinwiddie,* 76 F.3d at 925 (citations omitted).

▮▮▮ Thus, the Court must consider the entire context in which the statements at issue in this case were made.[10] Fr. Trosch's comments regarding Dr. Lucero were articulated in a New York television studio during the taping a daytime talk show which explores and exploits controversial subjects and guests in order to boost its ratings. The host of this talk show repeatedly prodded his guests in an effort to make them express their views in the most volatile manner possible, and forced them to answer complex, loaded questions in sound-byte form. His rapid-fire queries were couched in inflammatory verbiage, and he did not permit any of his guests to explain themselves in any detail. The producers of the show assigned Dr. Lucero and Fr. Trosch adjoining seats in an apparent attempt to elicit negative interaction between them. Additionally, before agreeing to appear with Fr. Trosch on *Geraldo,* Dr. Lucero was fully aware of Fr. Trosch's beliefs, both from having watched the *Shelly Stewart* episode and from having reviewed numerous documents written by

9. In his brief, the defendant relies on a recent district court case from North Carolina in which FACE was found to violate the First Amendment and to exceed Congress' powers under the Commerce Clause. *See Hoffman v. Hunt,* 923 F.Supp. 791 (W.D.N.C., 1996). Though the *Hoffman* decision expressly rejected the Eleventh Circuit's resolution of these constitutional issues in *Cheffer,* this Court is bound to follow *Cheffer.* Even were it inclined to do so, this Court cannot cavalierly deviate from the *Cheffer* holding as the *Hoffman* court did. Therefore, the Court reaffirms its prior finding that FACE passes constitutional muster.

10. The Court is limiting its analysis to whether the statements made on the *Geraldo Show* constituted threats to Dr. Lucero. The plaintiffs do not appear to contend that Fr. Trosch's remarks on *Shelly Stewart* were threats of force actionable under FACE as to Dr. Lucero. To the extent that the plaintiffs do argue that the *Shelly Stewart*

comments were threats of force against Dr. Lucero, those arguments are misplaced as a matter of law. Dr. Lucero did not appear on *Shelly Stewart,* and Fr. Trosch made no reference to him at any time in the broadcast. Rather, Fr. Trosch's statements on *Shelly Stewart* were limited to general comments about the doctrine of "justifiable homicide" and more specific remarks directed toward Dr. Derzis, another guest on the program. Dr. Derzis is not a party to this action. Accordingly, the Court cannot find that the *Shelly Stewart* statements, in and of themselves, were threats of force directed at Dr. Lucero, or that Dr. Lucero was "aggrieved" by Fr. Trosch's comments during that show. Under § 248, Dr. Lucero has no cognizable cause of action for the *Shelly Stewart* statements, standing alone. However, the *Shelly Stewart* broadcast remains significant to the extent that it provides context for the events which transpired on *Geraldo.*

**1130**

and about Fr. Trosch's "justifiable homicide" theory.

Dr. Lucero knew or should have known that the combination of Fr. Trosch's outspoken viewpoints and the sensationalist, melodramatic environment of a daytime talk show rendered it highly likely that Fr. Trosch would direct certain objectionable or uncomplimentary remarks at him. Indeed, Dr. Lucero's stated intention for appearing on *Geraldo* with Fr. Trosch was to stage a confrontation with Fr. Trosch or, as he put it, to "stop" Fr. Trosch. Although Dr. Lucero testified that he was frightened and intimidated by Fr. Trosch's statements on *Geraldo*, the Court cannot credit this testimony, as Fr. Trosch said only what Dr. Lucero could and should have expected him to say in such a setting. Finally, Dr. Lucero conceded that he had never seen Fr. Trosch at his clinic or at his home, nor had he had any contact with Fr. Trosch either prior to or subsequent to the *Geraldo* taping. All of these background facts undermine the plaintiffs' position that Fr. Trosch's statements on *Geraldo* should be deemed true threats directed at Dr. Lucero.

The statements themselves were extreme; however, Fr. Trosch qualified them on several occasions during the *Geraldo* taping. Three examples will illustrate this point. First, although he initially blurted that he would kill an abortion doctor if he had a gun in his hand, Fr. Trosch immediately softened his answer by saying that he would only approve of such a killing, and that, in his opinion, it would not be murder. *See* Plaintiffs' Exh. 42, at 2. Second, when Geraldo asked him if he had the courage to say that he would kill Dr. Lucero, Fr. Trosch evaded the question by stating that Dr. Lucero "should be dead". *Id.*, at 3. Third, in the show's waning moments, Fr. Trosch tempered his fiery rhetoric by asserting that he

is merely presenting a philosophical problem, and indicated that his cause is much better served by him doing that than it would be by his taking violent direct action toward Dr. Lucero or anyone else.[11] *Id.*, at 10.

Taking all of these circumstances into account, the Court is not persuaded by a preponderance of the evidence that Fr. Trosch's statements to Dr. Lucero constituted threats of force which were violative of FACE. Fr. Trosch qualified and minimized his more radical comments on several occasions, thereby blunting their impact on a reasonable recipient. Additionally, the confrontation between Fr. Trosch and Dr. Lucero on a nationally-televised, tabloid-style television program was one of Dr. Lucero's own making, or at least acquiescence. Dr. Lucero had previously challenged Paul Hill's espousal of the "justifiable homicide theory" on *Sonya Live* to "show that we will not necessarily be intimidated", and agreed to confront Fr. Trosch on Geraldo "to persuade public support to stop Fr. Trosch." Fr. Trosch's comments were made in response to questions posed on a talk show known for plumbing the sociological extremes of America's psyche. There has been no contact between Fr. Trosch and Dr. Lucero either prior to or subsequent to the *Geraldo* appearance, with the exception of dealings necessarily required by the progress of this litigation. Under these circumstances, the Court cannot conclude that Fr. Trosch's remarks on the *Geraldo Show* were made "under such circumstances that a reasonable person would construe them as a serious expression of an intention to inflict bodily harm upon or to take the life of" Dr. Lucero. *United States v. Callahan*, 702 F.2d 964, 965 (11th Cir.1983) (interpreting "threat of force" requirement with respect to 18 U.S.C. § 871).

11. In response, the plaintiffs argue that such a disclaimer was ineffectual. The plaintiffs point out that Dr. Lucero was aware of the fact that Paul Hill had made a similar statement shortly before killing Dr. Britton. However, Fr. Trosch's closing *Geraldo* comment echoes sentiments that he has articulated in numerous published interviews when asked if he could kill an abortion provider himself. *See* Plaintiffs' Exhs. 33, 37, 41. Dr. Lucero testified that he reviewed these documents prior to his *Geraldo* appearance. Fr. Trosch's consistent description of his role as that of a "teacher" is a circumstance which certainly operates to mitigate the otherwise-threatening nature of his other comments. Stated differently, Fr. Trosch's repeated denial, both in print and on *Geraldo*, of any intent to initiate direct violent action himself rendered his statements less likely to place a reasonable recipient of those statements in apprehension of bodily harm.

The Eighth Circuit's recent decision in *United States v. Dinwiddie*, 76 F.3d 913 (8th Cir.1996) is not inconsistent with this ruling. In *Dinwiddie*, the district court found that an abortion protester communicated threatening statements to an abortion provider on more than fifty (50) separate occasions spanning a six-month period. For example, on one of these occasions, the defendant in *Dinwiddie* shouted through a bullhorn outside the doctor's clinic that Dr. Gunn's untimely demise "could happen to you" and that "[w]hoever sheds man's blood, by man his blood shall be shed." *Id.* at 917. Additionally, the defendant physically assaulted a staff member at the clinic, physically obstructed patients from entering the clinic, and advised an administrator that "[y]ou have not seen violence yet until you see what we do to you." *Id.* at 925. Relying on "the manner in which Ms. Dinwiddie made her statements, the context in which they were made, and Dr. Crist's reaction to them", the Eighth Circuit concluded that her statements were "threats of force" that "intimidated" Dr. Crist. *Id.*

The statements made by Fr. Trosch were of a similar tenor to those articulated by the defendant in *Dinwiddie*; however, the context was vastly different. Ms. Dinwiddie shouted her words from a bullhorn outside an abortion clinic on a regular basis for six months, while Fr. Trosch uttered his remarks in the contentious setting of the *Geraldo Show* on a single occasion. Ms. Dinwiddie perpetrated several other violent actions which supported and reinforced the threatening content of her statements, while Fr. Trosch has engaged in no conduct which suggests that he could or would participate in a direct act of violence against an abortion provider. Dr. Crist did not invite Ms. Dinwiddie to pelt him with threatening statements, while Dr. Lucero affirmatively placed himself in harm's way by agreeing to appear on *Geraldo* with Fr. Trosch. In short, although the substantive content of the statements made by Fr. Trosch and Ms. Dinwiddie may have been similar, the Court finds that the context in which Fr. Trosch's statements were made renders them far less threatening or intimidating to a reasonable person than those made by Ms. Dinwiddie. Thus, the plaintiffs' contention that this case is analogous to *Dinwiddie* is lacking in merit.[12]

The Court having found that Fr. Trosch's statements on the *Geraldo Show* were not threats of force, the defendant cannot be held liable under FACE for having made those statements. However, the fact that Fr. Trosch has prevailed in this lawsuit does not mean that he may continue to make statements similar to those he articulated on *Geraldo* with impunity. The Court is not holding that statements such as those made by Fr. Trosch on *Geraldo* could *never* violate FACE. On the contrary, the Court's decision is heavily influenced by the specific circumstances surrounding Fr. Trosch's remarks. More to the point, this Court is of the opinion that Fr. Trosch's comments could, in fact, have constituted a violation of FACE had the context in which they were made been different. Certainly, Fr. Trosch remains free to express his philosophical views to the full limits authorized by the First Amendment, recognizing that the First

---

12. Likewise, the expert testimony of sociologist Dallas Blanchard, Ph.D. ("Dr. Blanchard") does not vitiate the Court's conclusion that Fr. Trosch's statements were not threats of force which violate FACE. Dr. Blanchard testified generally that abortion providers find themselves in a dangerous climate today, and that they should be fearful for their safety. He also asserted that the pronouncements of Fr. Trosch and other anti-abortion leaders have the effect of stigmatizing Dr. Lucero and rendering him a target. However, Dr. Blanchard's testimony focused on the evil effects of the "justifiable homicide doctrine" itself, and largely ignored the specific threatening quality (if any) of Fr. Trosch's statements to Dr. Lucero on *Geraldo*. In fact, Dr. Blanchard's testimony apparently was that Dr. Lucero's appearance on the *Geraldo Show*, in and of itself, caused Dr. Lucero to be more of a target, irrespective of any particular statements made by Fr. Trosch to Dr. Lucero. Therefore, Dr. Blanchard appeared to be of the opinion that the threat to Dr. Lucero stems from the general climate, and is heightened by Fr. Trosch's pronouncements of the "justifiable homicide doctrine". Though Dr. Blanchard's testimony may well be accurate from a sociology standpoint, the Court cannot hold Fr. Trosch liable under FACE either for the dangerous atmosphere facing abortion providers today or for his impassioned advocacy of the "doctrine of justifiable homicide", in the absence of a threat of force directed at Dr. Lucero. Dr. Blanchard's testimony does not undermine or otherwise affect this Court's analysis.

**1132**

Amendment does not offer refuge to true threats of force. If Fr. Trosch chooses to articulate his rhetoric in a manner which could reasonably be construed by its recipients as a serious expression of an intent to inflict bodily harm, he does so at the risk of incurring criminal and civil penalties under FACE.

### III. Conclusion

For all of the foregoing reasons, the Court finds that the plaintiffs' claims are due to be, and the same hereby are, **DISMISSED** with prejudice. By separate order, the Court is entering judgment in the defendant's favor with respect to all of the plaintiffs' claims.

It is so **ORDERED.**